**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SEAN PRESSLEY, | : | Civil No. 1:25-CV-00252 |
| Plaintiff, | : | |
| v. | : | |
| MARTEN TRANSPORTATION LTD, | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This case arises from an employment dispute between Plaintiff, Sean Pressley ("Pressley"), and Defendant, Marten Transport, Ltd. ("Marten"). Pressley worked as a driver for Marten until it terminated his employment following an altercation between Pressley and one of Marten's customers. Pressley now sues Marten alleging race discrimination and retaliation. Presently before the court is Marten's motion for summary judgment. The primary issue before the court is whether Pressley has met his burden under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). He has not, so the court will grant Marten's motion.

## BACKGROUND

### A. Facts

Marten is a transportation company that provides time and temperature-sensitive freight services throughout the United States, Canada, and Mexico. (Doc. 27, ¶ 1.) To provide these services, Marten hires both "over the road" drivers who

drive across the country and drivers assigned to "dedicated" fleets who haul freight for specific customers in regions of the country. (*Id.* ¶¶ 5–7.) In October 2022, Marten hired Pressley as a dedicated driver assigned exclusively to haul freight for Bozzuto's, Inc. ("Bozzuto's"), one of Marten's customers. (*Id.* ¶ 15.)

Between October 2022 and February 2023, Pressley was involved in two incidents while driving for Marten. (*See id.* ¶¶ 19–20, 23.) In the first incident, Pressley was at Bozzuto's when he overturned, causing the wing of his tractor to connect with his trailer. (*Id.* ¶ 20.) The second incident occurred several months later, also at Bozzuto's. (*Id.* ¶ 23.) Pressley picked up a load and performed a pre-trip inspection including a "tug test," where the driver presses on the gas while the brakes are on to ensure the trailer is properly connected. (*Id.* ¶ 23.) Despite performing this test, Pressley's trailer dropped as he was exiting Bozzuto's. (*Id.*) As a result of these incidents, Marten informed Pressley that any further mistakes could result in his employment being terminated. (*Id.* ¶ 25.)

In May 2023, Pressley was involved in another incident at Bozzuto's, but the parties dispute exactly what occurred. (*Id.* ¶ 26.) In Pressley's telling, he arrived at Bozzuto's to find the appropriate parking lot obstructed by unattended tractors. (*Id.* ¶ 34). He proceeded to park his tractor near Bozzuto's driveway and walked into Bozzuto's office to let them know where he parked. (*Id.* ¶ 39.) He informed an employee that he could not park in the appropriate spot due to the obstruction,

and the employee insisted he move it to the proper location. (*Id.* ¶¶ 41–42.) When Pressley told the employee that he could not do that, he contends that the employee "flipped out," began yelling at him, and called him a racial slur. (*Id.* ¶ 43.) As this was happening, Pressley contends he called Marten's night dispatcher, Marc Pardy, who overheard the Bozzuto's employee call him a racial slur and agreed with Pressley's decision to park his trailer where he did. (*Id.* ¶¶ 50–51.)

Marten contends the incident at Bozzuto's went quite differently. Marten asserts that Pressley had ample room to park his trailer in the correct location, and that the place where Pressley ultimately parked the trailer obstructed Bozzuto's driveway. (*Id.* ¶¶ 35, 37.) Marten also points to testimony from the Bozzuto's employee, a Bozzuto's security guard, and Mr. Pardy that none of them heard the Bozzuto's employee call Pressley a racial slur. (*Id.* ¶¶ 44, 45, 52.) Mr. Pardy further testified that he told Pressley that "he needed to wait, because we can't just drop trailers anywhere." (*Id.* ¶ 52.)

Following the disputed incident, several Marten employees discussed the event over email, including the fact that Bozzuto's asked to have Pressley removed from their account. (Doc. 27-2, pp. 3–6.)[1] They ultimately decided to terminate Pressley's employment and did so on or about May 22, 2023. (Doc. 1, ¶ 44.)

[1] For ease of reference, the court uses the page numbers from the CM/ECF headers.

### B. Procedural History

Pressley filed his complaint alleging race discrimination and retaliation under both Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA") on February 10, 2025. (Doc. 1.) Marten filed its answer on April 24, 2025, and then filed a motion for summary judgment and brief in support on January 30, 2026. (Docs. 8, 21, 22.) Pressley timely filed a brief in opposition on March 2, 2026, and Marten filed its reply brief on March 16, 2026. (Docs. 28, 29.) The court has reviewed Marten's motion, brief in support, and reply brief together with Pressley's brief in opposition. (Docs. 21, 22, 28, 29.) The motion is now ripe for resolution.

## Jurisdiction and Venue

The court has subject matter jurisdiction over Pressley's Title VII claims pursuant to 28 U.S.C. §§ 1331, 1343, and over his state-law claims pursuant to 28 U.S.C. § 1367. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

## Standard of Review

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is

not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that

there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Pressley's claims are all based on circumstantial evidence, so the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *See Qing Qin v. Vertex, Inc.*, 100 F.4th 458, 370 (3d Cir. 2024) (examining Title VII and PHRA claims under the same analytical framework). The analysis under this framework proceeds in three steps. Initially, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). If the plaintiff does so, the burden

shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The burden then shifts back to the plaintiff to produce evidence that the defendant's nondiscriminatory reason was pretextual. *Id.* at 247.

### A. The Court Will Grant Marten's Motion as to Pressley's Race Discrimination Claims.

#### 1. Pressley Established a Prima Facie Case of Race Discrimination.

Pressley met his burden at the first step. To establish a prima facie case of race discrimination a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action gives rise to an inference of unlawful discrimination. *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (citing *Jones v. Sch. Dist. Of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999)). The plaintiff's burden to establish a "prima facie case 'is not intended to be rigid, mechanized, or ritualistic.'" *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (quoting *Pivirotto v. Innovative Sys.*, 191 F.3d 344, 352 (3d Cir. 1999)). Indeed, the plaintiff's burden at the summary judgment stage is simply to show there is sufficient evidence "to convince a reasonable factfinder to find all of the elements of the prima facie case." *Burton*,

707 F.3d at 426 (quoting *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)).

Pressley established the first three elements, and Marten does not contend otherwise. (*See* Doc. 22, pp. 19–21 (arguing only that Pressley did not meet the final element of a prima facie case).) He is African American, he was employed by Marten for approximately seven months, and his employment was terminated. (Doc. 1, ¶¶ 21, 22–25, 49.) Accordingly, the court focuses on whether the termination gives rise to an inference of unlawful discrimination.

The facts surrounding Pressley's altercation with the Bozzuto's employee and employment termination are disputed, but, taken in the light most favorable to Pressley, they are enough to produce a prima facie inference of discrimination. Pressley contends that when he arrived at Bozzuto's he was unable to park his truck in the appropriate location. (Doc. 1, ¶ 27.) Then, when he raised this issue to a Bozzuto's employee, that employee screamed at Pressley and repeatedly called him a racial slur. (*Id.* ¶¶ 31–33.) He further contends that Marten night dispatch overheard this interaction and testified that the decisionmakers who ultimately decided to terminate his employment received an email about the interaction. (*Id.* ¶ 36; Doc. 22-2, p. 22.) These allegations, taken together with the claim that Marten did not investigate the altercation at Bozzuto's before deciding to terminate Pressley's employment, could allow a reasonable factfinder to infer unlawful

discrimination. *Cf. Benjamin v. City of Atl. City*, No. 12-cv-3471, 2014 U.S. Dist. LEXIS 28529 at *16 (D.N.J. Mar. 5, 2014) (assuming the plaintiff made a prima facie showing of race discrimination by alleging employer ignored complaints of discrimination). The court notes that this is a close case, but Pressley has presented enough evidence at this stage to establish his prima facie case considering that a "prima facie case 'is not intended to be rigid, mechanized, or ritualistic.'" *Willis*, 808 F.3d at 644 (*quoting* Pivirotto, 191 F.3d at 352).

**2. Marten Produced a Legitimate, Nondiscriminatory Reason for Terminating Pressley's Employment.**

Marten, in turn, met its burden by producing a nondiscriminatory reason for the adverse employment action. The defendant's "burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426 (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). Here, Marten introduced evidence of Pressley's previous driving incidents. Within four months of starting his work for Marten, Pressley was involved in two incidents. (Doc 27, ¶¶ 19–25.) In the first, he overturned his vehicle causing his tractor to connect with his trailer. (Doc. 22-2, p. 10.) About four months later, his trailer dropped as he was exiting Buzzuto's, which can create safety issues and damage equipment. (*Id.* ¶¶ 23–24.) Marten ruled both of these incidents to be "preventable incidents" and counseled Pressley that any additional

mistakes could lead to his employment being terminated. (Doc. 27, ¶¶ 19, 23, 25.) This warning, followed by the verbal altercation at Bozzuto's, establishes a nondiscriminatory reason for terminating Pressley's employment following the incident at Bozzuto's.

**3. Pressley Has Not Produced Evidence Such That a Factfinder Could Reasonably Believe That Marten's Articulated Reasons for his Employment Termination Were Pretextual.**

Having found that Marten established a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to Pressley to show this reason is pretextual. To meet his burden at this stage, Pressley must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Pressley attempts to do so by introducing evidence of a similarly situated employee not of his protected class that he alleges was treated more favorably. (Doc. 28, pp. 8–9.) A comparator employee "need not be identical but must be similarly situated in 'all material respects.'" *Qing Qin*, 100 F.4th at 474 (quoting *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d. Cir. 2018). Relevant factors include whether the employees had the same supervisor, were subject to the same standards, and engaged in similar

misconduct. *In re Tribune Media Co.*, 902 F.3d at 403; *see also Loving v. FedEx Freight, Inc.*, No. 18-cv-508, 2020 U.S. Dist. LEXIS 81739, at *22 (M.D. Pa. May 8, 2020).

Pressley identifies a former Marten employee, John Lotto, as a comparator. (Doc. 27, ¶ 86.) Mr. Lotto is similarly situated to Pressley in some ways. Like Pressley, Mr. Lotto was employed by Marten as a driver for Bozzuto's, and Bozzuto's requested that Marten remove him from their account. (Doc. 27-2, p. 3.) Further, Pressley testified that Mr. Lotto was outside of his protected class. (Doc. 27, ¶ 86.) And Mr. Lotto was treated more favorably than Pressley because he was laid off rather than having his employment terminated. (*Id.*)

Despite those similarities, Mr. Lotto is not a similarly situated individual because he differs from Pressley in a material respect—his misconduct. Prior to his employment termination, Pressley was involved in two accidents that Marten ruled preventable and was counseled that any further incidents could lead to employment termination. (Doc. 27, ¶¶ 19, 23, 25.) Mr. Lotto, on the other hand, had issues that Marten could not "necessarily attribute to [the] driver." (Doc. 27-2, p. 3.) That is a significant difference; an employee facing employment termination after a prior warning is clearly not in the same position as an employee who has no mistakes attributed to him or warnings. Pressley attempts to argue that Marten stated that Mr. Lotto "went through the same or substantially similar thing as

Plaintiff." (Doc. 28, p. 9.) But this is true only to the extent that Bozzuto's asked to have both Mr. Lotto and Pressley removed from their account. It does not change the fact that the two had materially different misconduct histories. (*See* Doc. 27-2, p. 3.)

Without further evidence beyond the comparator, Pressley has failed to meet his burden of showing that a reasonable factfinder could find that Marten's proffered reason was pretextual. Accordingly, the court will grant Marten's motion for summary judgment as to the race discrimination claims.

### B. The Court Will Grant Marten's Motion as to Pressley's Retaliation Claims.

#### 1. Pressley Has Not Established a Prima Facie Case of Retaliation.

Pressley's retaliation claims fall under the same burden-shifting framework as his discrimination claims. *See Qing Qin*, 100 F.4th at 470. To establish a prima facie retaliation claim, a plaintiff must show: "(1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1299 (3d Cir. 1977)). Pressley failed to establish a prima facie case, so the court need not continue through the other steps in the burden-shifting framework.

Pressley's retaliation claims fail because he did not establish a causal connection between a protected activity and the adverse employment action. Pressley argues that the causal connection between his alleged protected activity, reporting the Bozzuto's employee's use of a racial slur[2], and Marten terminating his employment is shown through the temporal proximity of the two events and Marten's failure to discuss the incident at Bozzuto's with him prior to his employment termination. (Doc. 28, p. 12.)

Temporal proximity alone can establish causal connection, but the timing "must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Qing Qin*, 100 F.4th at 466 (quoting *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004)). Whether the timing is unusually suggestive is "essentially fact-based" and depends "on how proximate the events actually were, and the context in which the issue" comes before the court. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). When proximity alone is not sufficient, the timing is considered along with any other additional evidence of retaliation. *See Qing Qin*, 100 F.4th at 466–67 (quoting *Thomas v. Town of Hammontown*, 351 F.3d 108, 114 (3d Cir. 2003)).

[2] Because Pressley failed to establish a causal connection, the court does not decide whether this was a protected activity.

Despite the brief period between the Bozzuto's incident and the termination, the overall context here indicates that the timing is not unusually suggestive of retaliatory motive. Pressley had already been involved in two incidents prior to altercation at Bozzuto's, leading Marten to warn him that any more mistakes could lead to termination. (Doc. 27, ¶¶ 19–25.) And "[a]n employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity." *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014); *see also Shaner v. Synthes*, 204 F.3d 494, 504–05 (3d Cir. 2000) (finding no evidence of a causal connection when employee received similar criticisms before and after the protected activity).

Indeed, the similarities between the events in *Ross* and the events here all but foreclose Pressley's retaliation claims. *Ross* involved a Family and Medical Leave Act ("FMLA") action, but FMLA actions are also analyzed under the *McDonnell-Douglas* burden-shifting framework. *See id.* at 191–92. The plaintiff in *Ross* received negative feedback from a customer resulting in the customer asking to have him removed from its account. *Id.* at 187. Following that, the plaintiff in *Ross* was put on a performance improvement plan ("PIP"), failed to improve, and ultimately had his employment terminated. *Id.* at 188–91. The court held that "[t]he fact that Ross was placed on the original PIP based on documented

performance problems well before his employer knew he was sick defeats any retaliatory inferenced based on timing." *Id.* at 194.

The same is true here. There is simply no evidence that the decision to terminate Pressley's employment was causally linked to him reporting that a customer used racial slurs when he had already been warned that another incident could lead to termination. Pressley has thus failed to establish a prima facie retaliation claim, so the court will grant Marten's motion for summary judgment on the retaliation claims as well.

## CONCLUSION

For the foregoing reasons, the court will grant Marten's motion for summary judgment. An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: October 26, 2026